New York Presbyterian Hudson Valley versus NLRB and New York State Nurses Association, docket number 6582 AG and 23-6036 AG are being heard by a panel constituted by Judge Jacobs, who is here, Judge Wesley, who I believe is present by video. We see you, Judge Wesley, can you hear us? Yes, I can. Thank you. And we can hear you and myself. We will proceed with that case. We will then take a brief recess, go into the roving room, and then we will return with a differently constituted panel for the rest of the cases. I understand from our clerk that all of the attorneys are present, and so I will dispense with the reading of the calendar. Why don't we move then straight into argument in that first case I mentioned, and I'm going to ask the clerk and deputy, thank you for the names of counsel. I understand we have Mr. Pope for the appellant, who would like to reserve three minutes for rebuttal, is that right? That is correct, Your Honor. And then we have division of time, seven minutes for the NLRB, and we have Attorney Sautter, is it? Yes. Am I pronouncing that right? Lucky. And then three minutes for Attorney Swearingen. Swearingen. Swearingen. Fifty-fifty. I'm adding 500 to that. Apologies. So why don't we proceed then with Mr. Pope? Thank you, Your Honor, and may it please the court. This is the hospital's petition for review and the NLRB's cross-petition for enforcement coming out of a decision in order of the board that reinstated a nurse who left an operating room in the middle of an operation. The sentencing member of the NLRB below said the disposition of this case shocks the conscience. The court should agree with that assessment. And we have three I want to turn to them in order, whether or not there's an absence of substantial evidence of anti-union animus, the flagrant misconduct. Could you tilt the microphones up? This goes for everyone. Could you tilt the microphones up a little bit, and just so we can hear you well up here? Yes, Your Honor. So that first point was the absence of substantial evidence for what? Of any anti-union animus. Any motivation that the decision taken had to do with protected activity. The second issue is whether or not is concerns of flagrant misconduct of Rosa Marie Tayo, the nurse who left the operating room during the surgery. And the third one is the fairness of the hearing conducted on basically an improvised basis over Zoom. About intent. Counsel, are you objecting my opinion by Zoom today? Your Honor, for the few minutes that we're going to be together, I think Zoom's going to work just fine. Five days of it was an absolutely excruciating experience, I think, for the ALJ, and it made them make some mistakes. So, and if I could testify, if I could testify. Excuse me, did you object to the process? We did. We did multiple objections during, when the process was ordered and in the exceptions to the board. Okay. When the hospital terminated Tayo's employment, the union had been recognized and there was not a collective bargaining agreement. So she was basically in the position of an at-will employee who could be fired for good cause, bad cause, any cause excepting a legal cause. So ultimately, this boils down to the board's general counsel had to prove that there was an anti-union animus in deciding to discharge her. And while this court reviews NLRB findings deferentially, as Judge Jacobs said in the New England Healthcare Employees case, deference has its limits and the court is not bound to abide by the board's derivative influences to inferences to the irrational, tenuous, or unwarranted. And that's amply present in this, in the board decision here. Moreover, you look at the record as a whole and you look, according to Universal Camera, at what is both supporting the board's decision and what detracts from it, and fairly detracts from it in the record. And here's how that plays out. Ophelia Byers was the person who this group of nurses and and she's made out to be the anti-union villainess here, but the facts don't support that assertion. First off, the testimony below told you that the reason that the union people went to speak to Ms. Byers was they thought that they could enlist her support and wanted to get her involved in contract negotiations. That suggests they think that she is pro-union, that they think that she was a sympathetic ear. And moreover, she was, that purpose of wanting to get her under the company's bargaining team is not even a protected activity. In fact, it's prohibited by the act to try to influence the composition of the management's bargaining committee in a situation. So it's wholly irrational to assume that there was any anti-union bias to begin with. And the remarks that she made were all, they show just that she was shocked. And they don't show any anti-union animus. They show that she was surprised by the group that came to talk to her and she was reminding them, and please read the testimony as I have over and over again, you will see that even the union witnesses will tell you that she was telling them that the union was outside of where it was supposed to have union activity. Now union can only have activity in certain areas in hospitals, where there's a Beth Israel case and many others that have talked about that. But in this instance, it's very easy to discern where that is because the parties agreed to it. They made an agreement that they would only have union activities in the union offices and they were outside the office. She was telling them you're outside of the office, you shouldn't be doing this, you should make an appointment with me, come to my office, or I'll go to your office. And that's all that there is. And any other inference drawn from what she said, it's just specular, it's tenuous, it is irrational. Counsel, and I understand that you're making, you're addressing the first point, but given the limited amount of time allocated, could you turn to what I think is your second point about whether or not, in your view, there was, I think your words were flagrant misconduct on the part of the, you know, just tie on. Yes, yes, your honor. I think that this case shares a lot of similarities with the special touch cases that were decided by this court. And they speak directly to the principles here. That what the, what Nurse Tayo did was she left the operating room in the hands of somebody who she's supposed to be supervising, precepting as they say. She was supposed to be doing that to train them in this particular operation. She didn't go through the steps of making sure that there was somebody covering her responsibilities in that. That there were somebody. What do we do with the finding that the person left behind, the the orientee, had participated in operations of comparable sensitivity and difficulty without a supervisor? Well, your honor, I don't think that the record will bear out that it's comparable, but it is, each of them are different, and they're different in significant ways. What do you make, what do you make of the fact that he was unsupervised four days later by another nurse, without, excuse me, without permission, without, from the, from Nurse Kelly, and as she sat outside talking with another nurse, she made that judgment on her own. Was she disciplined? No, your honor, she was not disciplined. Did she abandon the patient in the operating room? She conferred with Nurse Kelly over whether or not it was appropriate to be able to supervise Was she supposed to be present in the operating room, according to hospital policy? The assessment was made, your honor, that at that point, the prior experience of the preceptee allowed her to sit outside the operating room, just minutes away, or not even minutes, seconds away from the operation, and to watch it. At some point, at some point, somebody solos. Wait a second. The, the, the charge is, is that she abandoned the operating room, and that she did this on her own, made her own decision, and I'm asking you about three days later, same, same grantees, same operating room, and she's sitting outside. She didn't ask permission from Kelly to do that, did she? She, she had conferred with Kelly and was able to do that, your honor. I believe the she left. My, my recollection of the record is she left without permission, but immediately thereafter got permission. You got approval for it, but that her initial decision to depart the room was made by herself. Is that correct? We're talking about Nurse Sadoe. I think that's, I'm saying her name correctly. Yeah. Remember that. She went, she went and sought permission to be done through supervision from outside the operating room, and she went and sought permission. Right, but she left first. Hang on, hang on. I just, it's a very simple question. She left the operating room before getting the permission, correct? She did. Okay, and then, but you're saying she immediately thereafter got permission. Right. And that, I believe your argument is that, and then the permission was contingent on her staying right outside the operating room. Correct. I understand. Yeah. I'm out of time, but I would just make, make one point with regard to that, which is if Nurse Tayo had left the operating room and sought permission at, at that point, because you're allowed to leave the operating room as a, as a circulating nurse for brief periods of time. If she immediately sought permission, we'd have a different case here, because that would be appropriate if, in fact, somebody then made an arrangement. But she did not follow any of the established protocols for what you would do to leave the preceptee alone, you know, to, to get another nurse to cover, to have her supervisor's permission, or any of those. And that's why this becomes a patient abandonment situation, and why it is misconduct. Thank you very much. We'll now hear from your opponents. Good morning, your honors. May it please the board. I'd like to start by quickly actually correcting a factual point that was just made, and that is that your honors first are correct. Nurse Sidhu left without seeking authorization from, left the OR without seeking authorization, but she did not thereafter seek authorization from Kelly. What happened, if you go to the page 705 of the joint appendix, is Kelly testified, I found Nurse Sidhu sitting at the desk, at the reception desk of the OR suite, and I asked her, is it okay for Lazaro to be in there by himself? So this is not Sidhu coming clean and asking Kelly, oh, you know, I left him, is, is that okay with you? No, this is Kelly affirmatively asking that of Sidhu. And then when Sidhu says, yes, I think it's okay, Kelly defers to Sidhu's judgment and to Sidhu's assessment of Lazaro's capabilities. And that's the critical point here, your honors, because what Tayo did is exactly the same thing. Recall Tayo was the preceptor who worked with Lazaro the most of all the preceptors in the hospital. She worked with him about 50% of his entire training. She knew his capabilities in and out, and when she decided that she needed to leave the OR, she knew that this man had 28... But she doesn't make the assignments, basically. Lazaro and Tayo were assigned. Yes. So it'd be a hell of a way to run a hospital if people are assigned to do things and they decide that they can, they can walk away because actually it's okay, there are enough people there. It's one thing to go to the bathroom, it's one thing to take a short break, but basically in this instance, the petitioner, Tayo, has changed the staffing for this operation. Well, respectfully, your honor, I disagree for two reasons. First, we were just talking about Sidhu. Sidhu didn't just go to the bathroom. She didn't just leave for a few minutes. She stayed outside the entire operation, okay. Second... But she was right outside the door. She was... Outside the other side of the hospital. She was outside the door, but again, going back to the earlier point, she never asked for permission. She never asked for clearance for that. The hospital fired Tayo for not, for abandoning her patient supposedly, and for not engaging, as Mr. Pope said, for not taking proper measures to ensure that there was coverage in her absence. I mean, I guess the thing is, these things are not comparing apples and apples, right? And I guess what ultimately comes down to it is, given the level of deference that we have to afford the agency, is it close enough that these are apples and pears? And that they were sort of saying, well, close enough, roughly enough of an analogy that we're going to base a finding, or are these, I don't know, apples and watermelons? In which case the NLRB, you know, the board was completely out of line in finding a meaningful analogy here between those two things. Because obviously we can sit here and nitpick the distinctions. Sure. No, well, it's clear that you don't need two situations to be exactly the same. I mean, that would hardly ever happen in real life. So it's up to the boards to analyze and to explain why it thinks that these situations are sufficiently similar. Surely it's clear that one dissimilar factor is that Taiyo's leaving the operating room came to the attention of a very senior person in the hospital, and that's Byers. Yes. So the other things may have happened, but they may not have come to the attention of a senior person who felt obliged, perhaps, to act to make sure that this does not become a practice. Well, but your honor, Siju's actions came to the attention of Kelly. Kelly knew it happened, and yet there was no investigation, much less any discharge or reporting to the OPD about what Kelly did. Also, yes. What's the evidence of union animus, and do we need evidence of union animus? It seems to me you do. Yes, you need evidence. That's part of the right-line test. The first point is anti-union animus. What's the evidence of it? Well, first, your honor, the way that Byers reacted, calling their conduct, the employee's conduct, disrespectful and unacceptable, which, if it's- It's about the mildest possible language I can think of. It's like when you're disciplining a child and you say, that was inappropriate language. You know, that's like the mild, that is so mild. I mean, when we think of animus cases, we think of vulgarities, we think of people screaming, we think, but to say that was disrespectful, that's about the most polite possible way to count something. I mean, how can someone express, you know, disagreement or displeasure more politely than that? Your honor- It sounds like the only other way she could have said is, oh, I'm so glad you're here, when she's not. Well, I mean, what was she supposed to say? Well, I'm serious. What could she have said that would have been acceptable? I understand. When you, as a stepping outside of the parent-child relationship, when you, as an employer, as a supervisor, tell an and then you ask- Was there evidence that she was actually raising her voice, yelling? She was very angry. That is the testimony. No, no, no, different. Was there evidence that she was yelling? No, yelling. The sense of yelling, of raising a voice. I may have, I may have misspoken there. Well, that's important, right? Anger, anger, your honor. Anger, expressed anger, even contained when you see that in your boss. Give me the testimony that there was anger. Was that in a facial expression? Because if it's not in the tone- It was, Ms. Tayo testified that she got very angry. That I don't know. She didn't say specifically. She said that when the union representatives told, stepped in and told Ms. Byers, we are not being disrespectful. We are simply, the employees are exercising their rights to bring their concerns to you. She got visibly angry and she, that's when she referred to Tayo in particular. But that's not the only thing she did, your honor. She also demanded that every single employee there give their name and where they worked within the hospital. And even the hospital doesn't contest that that is clearly a threat of retaliation. That is clearly something that you do not do unless you are unhappy with what these people are doing right there. Why do you suppose the agreement with the union was that they would have one office and that they would confine their activities to that office? Your honor, that was an agreement with the union. The employees are still free to go about the hospital and to approach their supervisors and tell them we have concerns. But surely that means that the people in charge of the hospital don't wish to be engaged in union organizational behavior, approving it, disapproving it, taking positions outside the scope of formal negotiations with counsel on both sides. This agreement, as you as you just pointed out, this agreement was entered into within the scope of contract negotiations between the union and the hospital. Yes, your honor. The MOU doesn't define the geographic locations. I'm sorry, I'm having trouble hearing you, your honor. The MOU doesn't define the this idea that only union stuff can happen in the office doesn't prohibit striking or informational picketing or anything else, does it? No, it does not. It does not. Okay. It is solely an agreement that the union, when it comes into the hospital, will abide by certain rules, union representatives, I mean not employees, and that the negotiations will happen within a have the right to be there, who are working there every day, discussing and expressing their concerns to their managers. If I may, what other evidence of anti-union animus is there other than what you have said? So besides her comments, besides her demeanor, besides the fact that she asked them all to identify themselves, there's also the celerity with which the hospital started investigating these employees. Within minutes after the head of HR, O'Connor, minutes after he found out that this thing had happened, he was scrutinizing CCTV to look at, identify all the employees. Now he says he was concerned about a security breach at the hospital, okay, but what does he do? He identifies every single employee who was there, and then he proceeds to verify whether this happened during their working time or not, and there's a case in our brief, Loyst, where the Board found animus specifically for that. Right after noticing an employee engaging in protected conduct, the employer went and checked to see was he working at the time or was he on some kind of approved break, because if he was working, then we can come down on him. And not only that, Your Honor, but after he did that, he, oh, that's one thing I forgot. These employees were not a security risk. They weren't there all the time, and in addition, O'Connor did not know, did not have any reason to believe at the time that they had engaged in any misconduct. Any of them, including Taya. Well, for the videotape, they saw Taya wearing her head net, right, and then wound it back to figure out, oh my gosh, she had left an operating room, right? Let's say, hypothetically, she had been the only circulating nurse and there had not been an orientee there. Would all your arguments play out the same way? If she had been the only circulating nurse during that operation and decided to walk out on her own, would all of these indicators still, in your view, point towards anti-union animus, had she been fired, if that was the only difference in this case, that there was no Lazzaro? Two points, Your Honor. I cannot speak to what the Board would have decided in another case, so this is just my, this is not the Board speaking, this is me. Sure. The second point is, at the time when Byers is speaking, when O'Connor is doing his investigation, they don't know who's in the OR. They don't even know that Taya was in an OR. And so, yes, I would argue, Your Honor, the animus is still there. Now, maybe later, as part of the analysis, you can find that, in that circumstances, that Taya really did engage in misconduct. But the animus itself, before they even know what's happening, before they know the situation in the OR, yes, it's there. They are reacting, not to misconduct, but to protected activity. Okay. Under the labor laws, if Taya returns, would the hospital be privileged to decide to assign her to less critical operations or duties, as a result of what it is she did? No, Your Honor. Under labor law, she's entitled to the same position or equivalent position, or if that position no longer exists, then something of an equivalent. So she would be entitled to participate in the most complex operations and would have the ability to leave at will? Yes or no? No. No, Your Honor. If the hospital changes its practice and no longer considers, as part of its clinical training program, that nurses are allowed and should judge the capabilities of their orientees and specifically their ability to work alone in the OR, if the hospital changes that, then obviously she has to abide by those rules. The way the practice was, the hospital tolerated, as we saw for nurses, based on their assessment of the orientee's abilities, to leave the OR for a certain amount of time. And I would remind Your Honor that Taya only left for 28 minutes. She wasn't gone the whole time. So just to paraphrase what I think you're saying, is that if this is that big a problem for the hospital, the notion that preceptors leave, they can create a written policy and they can it doesn't have to be written, but they have to clarify and they have to show that they don't treat other nurses differently. They have to show consistency. The easiest way for them to do that would be to adopt a written policy and then to enforce it equally. Exactly. Because again, the board did not make any finding as to whether Tayo's conduct was misconduct, patient abandonment, anything like that. What the board found is that Tayo was treated differently than other nurses, specifically Siju, and that the only thing that she did that Siju didn't do is that she engaged in protected conduct. Anything further? Judge Wesley, remotely? No? Okay, thank you. Why don't we hear from... Thank you, Your Honor. And we ask that, of course, that the court enforce the board's ordering full. Thank you. Thank you. Ms. Swearengen? Good morning, Your Honors. Kate Swearengen from Cohen Weiss and Simon LLP for the Intervenor New York State Nurses Association. I only have three minutes, so I want to try to pick up off some of Your Honor's questions. To the point Your Honor made, with Tayo's leaving the OR is different because it came to the attention of Byers, a very senior person. That's absolutely correct. And Your Honor, I submit that if Tayo had left the operating room wearing her bouffant and had gone down to the ground floor where the cafeteria is housed to retrieve a soda from the vending machine and had come to the attention of Byers, this investigation would not have happened and this termination would not have happened. This happened because Tayo was engaged in protected concerted activity. To Your Honor's question, are these apples and pears or are these apples and watermelons? These are apples and pears. And with Your Honor's permission, I would like to read some of the record testimony about Sidiou and what happened on March 2nd. So we're at page 705 of the record and this is when Kelly is testifying on cross-examination and counsel for the general counsel asks her about the arrangement on March 2nd. And Kelly says Kevin Lazaro, the preceptee, was alone for most of the day for this case. Marissa Sidiou was the preceptor. She was with him for the beginning of the case. She was there until the case got underway. She, actually she was sitting at the front desk with me. She said Kevin is okay. She kept checking with him on a 15-minute basis. I do remember because she was sitting at the front desk and I asked her, are you comfortable with him being alone? Is he comfortable? So Your Honors, that sounds to me not like something that Sidiou sought permission for. It sounds like Kelly noticed that Sidiou was there outside of the OR as Tayo had been outside of the OR and only blessed this arrangement after the fact. Moving on to some questions about Animus, the New York State Nurses Association made the point in its brief, the NLRB did not, but NISNA asserted that there was this 19 or 20 year history of granting annual merit bonuses to the nurses and that the hospital unilaterally discontinued this practice only when NISNA was voted in as collective bargaining representative. And while the board and the ALJ did not rely on that fact, it is in the board's statement of facts that this happened. So NISNA would submit that this is an additional reason to infer anti-union Animus on the part of the hospital. I wouldn't want to assume that somebody stops paying bonuses if the union is about to come in so that you can negotiate with the union to give bonuses. And that's probably the hospital's position, Your Honor, and the union's position was that the unilateral discontinuation was unlawful. That that was done in retaliation for the nurses having selected NISNA as their collective bargaining representative. Another point I'd like to make is to draw Your Honor's attention to a letter in the record from Dr. Rossner. He was one of the surgeons present on February 25th. He didn't say anything about the surgery, right? I mean, it's all generally like, I like her, she's great. It is generally. Let me just ask, does it say anything specific about this event? It does, Your Honor, because it makes a disparaging reference to the traveler nurses in the hospital, and that point is important. What does it say then? Okay, let me pull the letter just a second. I guess the thing is we're relying on the, we're reviewing whether there's substantial evidence to support the decision of the agency here, right? Yes, Your Honor. So I think the focus that's most helpful for us is what was the rationale employed by the agency, and was it supported under the law? Yes, Your Honor. One of the points the agency made, one of the points the board made, was that on the day in question, on February 25th, traveler nurse Nikki Persons, Nikki Perkins, worked in the OR for 45 days. I assume that that's a very important point, because there is testimony in the record when Kelly is questioned. Kelly, the one who made this assignment, who approved the traveler nurse to be there while Tayo and Lazaro were absent, and Kelly is asked specifically, well, what did you know about traveler nurse Perkins and her experience with this type of procedure? If this type of procedure is really so special that Lazaro was not equipped to handle this on his own, what did you know about Perkins? And Kelly testifies at page 600 of the transcript that Nikki Perkins was a traveler nurse who was here with us, and she had an interest in orthopedic and neuro cases. So I felt confident that she was the right nurse to put in the room that day, because of her interest, Your Honors. She wasn't being orientated. No, Your Honor. She was a travel nurse. She was a travel I don't either. I know she was not, however, an orientee. An orientee is a person who is not The point is that Kelly had no idea what her background was, correct? That's correct, Your Honor. She was on her... And she allowed her to be the supervisor, to fill in without any background knowledge as to what Perkins' capabilities were, whether she'd worked in an OR before. She was a traveling nurse. She could have been from Rochester, for God's sakes, or from Timbuktu. Which are the same, which are basically the same. I might add that Rochester has a lot better health care than New Haven, but given that... That's absolutely correct, Your Honor. The record reflects that the traveler, Perkins, was on her first 13-week tour of duty with the hospital, and... A stranger to the hospital. Yes, Your Honor. Yes, Your Honor. A stranger to the hospital and a stranger to Kelly, and one can be able to say, yes, I reviewed her credentials. She was equipped to handle this procedure. She had handled this procedure ten times in the past. One can assume that Kelly would have said so. Are there any further questions? Just checking. Judge Wesley, anything? No, thank you. Okay, well thank you very much for your argument. Why don't we hear from Mr. Pope, and we'll try to cue as closely as possible to the three minute rebuttal time. And I'll try to help you with that, Your Honor. I think that, first off, the issue on Nikki Perkins is a bit of a red herring. What Kelly said was that she had extended discussion with Perkins and felt comfortable with her experience. And that's all you can do with a traveler, because we don't have the full records of it. She felt comfortable that she could go in there, and it doesn't suggest anything in terms of not being important to have the right person in the room. She thought she had the right person. What I want to make a point of is that Ms. Swearingen goes a little short on reading the statement of 705, which I would have read to you if she hadn't. There is additionally, it says, and I asked her, are you comfortable with him being alone? Is he comfortable? Yes, I'm going to continuously check on him. And if you read the statement of it, what happens is, Sidhu comes out and sits at the desk with Kelly, and Kelly says, well, why aren't you in the room? And she says, well, I think we can do this by checking on him every 15 minutes. Shouldn't leave him alone for 28 minutes, which admittedly Tayo did. But she said, I believe we can do this in 15 minutes. He's already got some experience. I'm comfortable with this. They sat there and had the back and forth. So it is an entirely different situation. Excuse me. Wasn't the hospital policy, your stated policy, when it let Tayo go, that that wasn't her call? Yes, it wasn't her call. Excuse me, that it was Kelly's call, not hers, right? Yes. So she was in violation of the policy. Yes, no, Sidhu was not, but Tayo was. You would admit that she was in violation of the policy, right? With regard to, Sidhu was in violation of the policy. She was not, your honor. She made the decision. She came out and spoke with Kelly. Kelly is the person who she's supposed to speak to for this. She didn't come out. She was out. She was out of the room. Kelly comes up. Kelly says, why aren't you in there? She says, well, he's okay in there. And Kelly allowed her to make that decision without Kelly's permission. Isn't that the case? Your honor, I don't read the record that way. I don't agree with you on that. I believe she comes out and sits down with Kelly immediately. And they have that discussion, which would be fair because you're allowed to go out of the room for short periods of time as a circulating nurse. I want to make a point out of this notion that somehow the MOU didn't have any impact on this. The union makes an agreement for the employees. NYSNA representatives were present at this meeting. Now, that is the union. They weren't employees of the hospital. And that's the entire reason, too, that there's a subsequent follow-up for security purposes, because those representatives admit they did not go through the security protocols of the hospital as they had agreed to do in the MOU. In fact, the testimony of the NYSNA representative at the hearing, Mr. Ferguson said, no, I didn't go through security. I didn't have a badge. I didn't do any of that. So there was grounds for an immediate investigation having to do with a security concern. The idea that this is somehow suspicious, that anti-union animus worked in this. But the point of the NLRB is that they didn't just investigate the union reps who came in, but they also investigated the employees who were allowed in the space, right? Isn't that their argument? And your argument, I think, that yeah. And then because they were trying to figure out who was all there, they discovered this one nurse walked out of an operating room, and that was a horrible thing. But their argument, right, is that, well, why did you look at the employees at all, right? Well, because we had to figure out who was there, and we had to figure that out. And yes, Your Honor, you're right. The whole point with Tayo is she looks out of place. She's got surgical garb on, and that shouldn't be somebody down in the cafeteria. Normally, if you're done with your surgery, you would take that off to go down to the cafeteria. Okay. Judge Wesley, anything else? No, thank you very much. Thank you both. They're all three of you. All right. Well, thank you all. We will take the case under advisement, and we will stand in recess ever so briefly.